Thank you, Your Honor. May it please the court, Stanley Blackman for the appellant Thompson Thrift Construction and Fidelity and Deposit Company of Maryland. Something strange has happened since the district court's decision in this case. After initially bringing and trying this case on the theory that Thompson Thrift breached the subcontract by providing defective site plans and namely an erroneous existing condition survey, D2 has changed course. It now says that it was promised and is entitled to a change order because it excavated more soil than it calculated it would during the bidding process. But the problem with D2's new theory is that the excavation work that it says entitles it to a change order and that forms the basis of its claim is the same excavation work that it was contractually obligated to do under the subcontract from the outset. And the reason for that is what the subcontract says and what it doesn't say. The subcontract doesn't say that D2 is entering into a contract to excavate a certain volume of soil. It doesn't list any cubic yardage amount of soil at all. Indeed, Thompson Thrift made no representations, contractual or otherwise, about the total volume of soil that would be present on the project site. D2 made any volumetric calculations in this case. Instead, what the subcontract says at 4567 in defining the scope of work is that D2 scope of work is site grading to be performed in accordance with the project plans. And it is undisputed in this case that the plans that determine the volume of soil excavation, the plans that D2 used to calculate that volume of soil was the difference between two plans. As D2 itself says in its red brief, by comparing the existing conditions to the proposed grading plan elevations, D2 could determine how much soil would be excavated. And on that point, your honors, the district court made a critical factual finding with which we agree, but that compels the reversal of its judgment. The district court expressly found that the evidence was insufficient to conclude that the existing conditions, topographical survey was erroneous. Put differently, the plan that governed D2 scope of work and the plan that D2 used to calculate the volume of soil excavation, the district court didn't find that there was anything wrong with it. Now, in light of that factual finding, D2 now says for the first time after years of litigation that the accuracy of the plans was never the dispositive issue in this case. But the record says something quite different. Throughout this litigation, including in the joint pretrial order, including a trial, including after trial, D2 repeatedly said that it excavated more soil than it expected to because Thompson Thrift provided it with an erroneous existing conditions. So the district court just didn't agree with that. And because it's undisputed that that plan governed D2 scope of work and the district court didn't find that plan was wrong, it's impossible for D2 to have done any than what it was contractually obligated to do. And where that leads is that the alleged change order to compensate D2 for excavating what it says is additional soil lacks consideration and is legally unenforceable. Because under Texas law, a subcontractor is not entitled to more compensation for doing work that's required in the performance of the contract, even if unforeseen difficulties make that work harder or more expensive than the parties anticipated. And in fact, that long settled feature of Texas law likely explains why D2 brought this case as a defective plans case in the first place. But again, that theory doesn't work here because the district court didn't find that the relevant plan, the existing condition survey was wrong. And in any event, the subcontract is unambiguous on the key point. Nothing in it shifts the risk of defective plans from the subcontractor, the default rule to the contractor here, Thompson threat. So the district court's contract based finding cannot stand and its remaining findings fail with that contract. So your honor, starting with the breach of contract claim and we'll call D2's new theory of the case, which is that there was excess soil and someone promised to change order. Ergo, that's the breach of contract. Now that that new claim fails both procedurally and on the merits. Now it fails procedurally because that is not the claim that D2 presented below. On the contrary, throughout this case, D2's theory was defective site plans. For example, in the pretrial order at 22 94 D2 contended that the actual site conditions and elevations were not properly reflected on the existing conditions at the pretrial conference. In the opening statement, D2 repeatedly argued to the district court that there was extra soil in the site and it had to come. This is D2's counsel. Logically, it had to have come from one of two situations, either over excavation by my client or the survey was incorrect. In its proposed findings of fact, after the trial at R. O. A. 25 15 D2 said in his proposed findings, the topographical survey was an error and accounts for the 40,876 cubic yards of excess soil that had to be excavated. And the district court's factual findings its findings of fact and conclusions of law at 29 04. The district court even recognized that the so called excess soil was what D to believe exceeded expectations derived from the existing conditions survey. So this has always been a defective plans case. Indeed, you can't now press a new theory of the case to try to affirm the to suggest that as decided by the district court is the quote that this isn't a defective plans case. But the district court can't try a case that D two didn't put on under several principles of party presentation. The district court had to decide the case that the parties put before. And the case that D to put before the district court was that the existing condition survey was wrong. Mr Blackman, if that's the case that the basically what I think what you're saying is the judge judge ended up viewing this case differently than it was presented to her. Why didn't you file something after the decision, you know, asking for reconsideration or just basically pointing this out to her and giving her a chance to fix it first? Well, your honors, D two in his response brief has kind of adopted this new theory of the case. The district court kind of relied on this balanced side idea as being the basis for being the basis for the claim. And this court is held in Baraglia versus the Board of Supervisors and in Colonial Pen that a party is not required to file any sort of post trial motion on a bench trial to hope to basically the challenge on appeal that the district court's findings don't support its judgment. So there was no requirement that a post trial motion be filed because this was a bench trial. But again, we'd say D two's response brief is what creates kind of this new theory. This could have. I mean, just because you don't have to. I'm not saying you're barred from making this argument now, but but I mean, these are the types of things that can be fairly if you're right, that she just misconstrued the plaintiff's claim. That's the type of thing that that can be fairly easily resolved on a motion for reconsideration. But but I mean, we are where we are now. So we're here. Well, yes, but again, your honor, we would say that it's D two that has now come up with another type of breach of she transformed a balanced site representation or the district court transformed the balanced site representation into the basis of D two's claim, which is a breach of warranty claim and not a breach of contract claim that D two D two pleading. Uh, but I'll actually go to the balanced site because I think that that's important. It permeates the district court's order. The district court found that there was the balanced site representation was a material representation of fact upon which D two justifiably relied. Now there are three issues with that balanced site finding as it relates to the district court's judgment. The first is that it's a red herring and it's irrelevant. D two's claim here was about the volume of excavation work being more than it anticipated based on a comparison between the existing conditions and the final grading elevations. A balanced site as D two conceded has nothing to do with the total volume of soil that's going to be present on the site. It has to do with whether the parties expect to either import soil onto the site or exported off of the site. That wasn't the basis for D two's breach of contract claim. So first, the balance site simply doesn't matter to D two's theory of the case. Um, but again, the district court treated it is basically the basis of a breach of warranty. Again, the district court said it was a material representation of fact upon which D two justifiably relied. But this court, an interstate contracting corporation, which the district court's order doesn't even cite, said that for a warranty claim, the plaintiff has to show an affirmative representation, justifiable reliance and no further investigation. D two expressly said that it didn't rely on the balance site representation. That was its corporate representatives testimony on direct examination. The subcontracts provisions also foreclosed reliance. And there was a further investigation. In this case, D two did a take off analysis, which told D two that it wasn't a balance site due to D two came back to Thompson Thrift and said, We don't think this side is balanced. So even if D two had pleaded a breach of warranty claim, which it didn't, uh, that the evidence doesn't allow D two to prevail on that claim. And third, even if that balance site representation is treated as the basis of a breach of contract, this court in I. C. C. Explained how a defective plans contract case proceeds. This court held the plaintiff has to show both that the plan was defective and that the contract evidenced an intent to shift the risk of defective plans from the subcontractor to the contractor. D two has never pointed to anything in this contract that shifted the risk of Thompson Thrift. In fact, this contract contains the opposite for me. D two contractually agree that the documents it received were sufficient to provide for the completion of the work. D two agreed. Yes, Judge Clemens. Let me ask you a factual question about the dirt. What is your client? Where did they draw the line between additional work within the scope of the contract and extra work that would have required a change order that your people had agreed to at some point? Yes, Your Honor. So again, it really depends on what is this, how the contract defines the scope of the work. And it would start with R. O. A. 45 67, which defines D two's work not in terms of volume and not in terms of how much soil it would have to excavate. It defines it terms of an activity site grading in accordance with the project plans. And so the line between additional and extra work is whether or not what D. Two did. This excavation work is something that was required in doing site grading work in accordance with existing conditions survey and the final grading plan. So in this context, excavating soil is exactly what D two agreed to do in the first place. And again, Thompson Thrift didn't tell D well, there would be or how much soil to expect. Those numbers came from D. Two. We don't know what D. Two went in thinking the total volume would be. We just know that now they say there's 40,000 cubic yards more than they expected. Eso that soil excavation is in line with the work. The contrast would be things like hauling these hauling excess soil or excess material off. D two acknowledges in his brief that it was paid for doing things like performance of simple site. So that is the factual distinction and the legal distinction between what D two is saying is that what it agreed to do with site excavation, a delta between the existing conditions and the final grading plan and the amount of soil that it takes to go from A to B from existing to final. That is what D two contractually agreed to do in the first place. But again, your honors, the, um, defective plans theory, which is the entire basis of D two's case that the survey was wrong and that accounts for the excess soil. Uh, the district court didn't find that to be the case, and D two cannot contractually have done any additional work or any extra work, any compensable work because that work is what it agreed to do from the start. It agreed it to move. It agreed to move the site from the existing conditions to the final grading plan, and the district court didn't find that plan was wrong, and everyone agrees that the site reached the final grading plan elevations. But I'd like to turn briefly to the district court's quantum Meroweth and remaining findings. The district court said that even if this is outside the scope of the contract, D two was entitled to recover under quantum Meroweth. But that's not the right question. The question is not whether D two went into this expecting that it would have to excavate a certain amount of soil. It's whether the contract required it. And again, here, the contract defined D two's work in terms of an activity. It defined D two's work in terms of performing that site grading to go from point A or elevation A to elevation B. And as Texas Supreme Court has recognized repeatedly where the work is called for by the contract, the contractor must look to the contract for compensation. That's the Black Lake case from the Texas Supreme Court. So the district court's finding that D two didn't anticipate this soil and the parties didn't adequately explain where this soil had come from can't support a quantum Meroweth finding. Believe it. I mean, the district court's quantum Meroweth finding says, as you phrased it, if it's out, if this work is outside the contract, so that was based on her contractual view that this work wasn't covered by the contract, which you obviously disagreed with. But it seems to me if you're right that this work was required by the contract, and even even the district court wouldn't have applied quantum Meroweth because, she says, if it's if the works outside the contract, it's also compensable and in quantum Merriott. Do you see what I'm getting? Right, Your Honor. Again, we believe the district court asked the wrong question. It effectively said that Thompson Thrift and D two didn't anticipate this work is being included in the contract. Therefore, D two could recover under quantum Meroweth. I guess what I'm saying is even under the district court's order, both the contract and the quantum Meroweth findings depend on the district court's view that this was quote outside the on that one key finding, which will have to decide whether we agree with that or not. Yes, Your Honor. We agree with that. And D two we would point out. It's not cited a single Texas case that has allowed a subcontractor to recover in these situations. Uh, see my time's expired. All right. Thank you, Mr Blackman. You reserved four minutes for a bottle. All right, we're here for Mr Summers. Good morning, Your Honor. My name is William Summers and may it please the case is just is a breach of contract case, which involves two separate and distinct contract damage awards. The first was Thompson's thrift failure to pay $81,068, which indisputably D two is out. The court denied all of Thompson Thrift's back charges and counterclaims and rendered judgment for the $81,068 together with interest. They're off. Texas is long recognized the doctrine of substantial performance, and this goes back to the Supreme Court decision in 1984 that deals with the invocation of substantial performance, which allows a contractor who is substantially performed his work. It is not fully completed his work to sue on the contract and not be that Skip Sandell was the only expert witness who testified what the reasonable and necessary cost to complete the work is. The Vance case specifically laid the burden of proof on the party not completing to come forward with competent evidence about what those reasonable and necessary cost to complete work in Mustang Pipeline versus driver pipeline. In 2004, the Texas Supreme Court said that must be done by bringing forth an expert witness who can qualify and testify what the necessary work is to complete and what the reasonable charges would be. Therefore, at the time of trial, Thompson Thrift brought no expert forward. They tried to get some information out of Mr. Brett Laffey, who had never been designated as an expert witness, and then they brought on their CFO from Thompson Thrift to prove up what they paid out. But they didn't offer any expert to necessary work was and what the reasonable charges would be. Therefore, the only evidence before the court was the testimony of Mr Sandell, which Judge Ramos adopted, and she made the compensatory award for the breach of contract for non payment for both the retainage and a progress payment based upon Mr Sandell's testimony. Let me ask you just a basic contracts question. Let's say I contract with someone to to renovate my part of my house, and the contract says, Oh, because of that, you're gonna have to knock out some walls, and we have a deal. It's in the contract is, Yeah, you're gonna knock out three walls, and the contractor comes and boy, there's a It's a lot harder than they thought to knock out those walls for whatever reasons. I mean, isn't that their problem? If the contract contemplates that that's what they had to do, they've got to do it, whatever, whatever the cost may be, and they can't ask me to give them more money than I agreed to. That's correct, Your Honor. However, that's what's different. I'm sorry. So what's different here? Because it looks like part of you were agreeing to do the excavation work, which meant removing this dirt. Um, what's what's different here than my hypothetical? Well, I was talking about substantial performance of its work of the original contract. The claim for the extra dirt is separate and apart, and there's a contract provision that specifically allows for the parties to get together, much like the I net case that this court decided back in 2000 and 16. But before I get to that point, if I could just redirect your attention to the two separate and distinct damage awards for the breach of contract, the one was for the non payment, and that's the one. The court denied all of the affirmative claims by Thompson Thrift for completing the work, and they offer no evidence for that. Now, I heard in the direct statement by counsel that this was this is a breach of warranty case. Well, they're really talking about an implied warranty that's created through dicta in the Lonergan case that followed through in the Mass Tech and the Interstate Commerce case. This is not a breach of warranty or an implied warranty that Lonergan seems to suggest is an implied warranty. An implied warranty type of implied warranty cause of action is one sounding in tort, not in contract. A breach of an express warranty, as this Supreme Court found in Medical City Dallas Limited versus Carlisle Corporation at 2 51 3rd 55. An express warranty is a result of negotiated exchange and a creature of contract that hence it is a breach of contract cause of action and not an implied warranty claims. He too did not did not plead a breach of an implied warranty, and the trial court did not address a breach of an implied warranty. Um, Thompson Thrift. Moreover, one of the things that happened that this court needs to consider is, uh, there was an exchange going back and forth in the bidding process. Thompson Thrift hired a expert witness to come in and challenged what he too did with respect to estimating the quantity of take off. And that hired gun offered no criticism as to way the way D two calculated the volumetric measure of dirt they were going to have to supply. Remember what they were told? They were given a topographical survey and said this is the vertical survey of the property from which you should take your volumetric calculation to determine what the proposed or the planned elevations were. In the case, the court specifically found that during the performance of the work, all of the work was done in accordance with the plans and specifications. All of the elevations that were required to be required. That makes everybody wonder. Where did all this excess dirt come from? They offered several suggestions as to where they thought it might come from over excavation. But during the measuring during the actual performance, every step of the way it was measured by the Thompson Thrift project manager of the site and other people testing labs that came out, and they said it's at the right elevation. Go. That's where it's supposed to be. That's what they were required to do. Now, back to the question that Judge Casa asked a few minutes ago with respect to what happens when you're doing something that is so far beyond the scope of what the parties anticipated going into the contract would be. What we have in this particular case, and as the court found there was a direct representation that it was a balanced site. Sure, there was negotiations back and forth between Mike Vetter and Mr Sandell and the Thompson Thrift people with the Thompson Thrift asking the D2 people to recalculate this, take this into consideration, to where at the end of the day there is to have been no import or export of material from that site for the spoil removed on the project. So where did it come from? Well, what happened during the course of performance, as the court may have read in the record, the two months before D2 started its work, we had an unusual meteorological condition. It rained continuously for two months. So by the time D2 could mobilize and get to the project site, Chad Peterson, who was the project manager for Thompson Thrift at the site, met them and said, we don't have time for you to go back and check whether or not the survey we provided to you is accurate or not. Clear the site. Go ahead and get it going. Show progress. Get this project ongoing. So as a result, D2 did, and the court found that by having D2 do that, it became impossible to determine whether or not the original topographic survey that simply shows the elevations of the existing site conditions was incorrect or not. So what we did is we had our guy come in, Apicola, who went through the term right now. It's when you can't prove something directly, you prove it by negating all the other possibilities and showing what the most probable likelihood of the cause was. And that's what we tried to do at the time of trial. So in answer to your question, no one anticipated 44,000 or 40,000 or I think what the court finally found, 36,000 additional cubic yards of dirt that had to be exported from the site. We still removed it, and the price, that's fine. Yeah, no one expected how hard it would be on which. So the question becomes who bears that burden? I mean, to go back to my hypothetical, no one expected this contract. You need to rent a special machine they didn't have, you know, to knock out my walls. Eso the question becomes who bears that expense? And and Texas law seems to say it's if you agree to do something, you bear that expense in less. The contract shifts the risk the other way. So what in the contract says that that, um, the other side had to pay because of these unexpected difficulties that I don't think anyone's disagreeing that there were unexpected difficulties with doing this excavation. The answer to that question, Your Honor, is found in Section seven of the exhibit J one, which is the subcontract between D two and Thompson thrift. And it reads, Should there be a dispute as to whether certain work is extra work or as to the amount of a change order, the subcontractor shall, upon request of an express written directive signed by the contractor, performed the disputed extra work, and the party shall endeavor to resolve the dispute. This clause is not verbatim as to what this court found in 2016 in the eye net case, but it's pretty darn close. Now, what this basically means is there is a risk shifting clause. If the court will go and look at the mass tech case and the I C C case, I recall the court. The I C C case is 2000 and five on. I believe the mass tech case was 2000 and 12. There's been this evolution going on in the construction interpretation of construction contracts. What? What are the parties agreed to in the mass tech? And in the I C C case, there is clear, unambiguous, concise language that says the risk was assumed by mass tech, and the risk was assumed by I C C. That's not what we have in the D two contract. We have this clause. I just read to you that says if there is a dispute as to whether work is required or not, or is extra work, then the parties are going to get together and resolve it. Um, resolve the dispute. How are they going to do it? The cause specifically said there should be a written directive ordering D two to perform that work. However, as the court found, and I think there were 17 different change orders the way this occurred on this project between these parties with respect to each one of the changes Thompson thrift asked for to be done to the scope of work. It was done verbally. The work was almost fully performed before the change order ever caught up with the status of the contract itself. Now there is one interesting change order number 11 that's involved in this, where Thompson thrift changed the plans in early May of 2015. They did not deliver those change plans to D two until August of 2015. After most of the excavation work had been done, and really all that was left to be done at that point in time was what we call in the industry the flat work. So the problem they had is they didn't give a written change directive like required, but the court found that they had waived that requirement for that extra work to have been done. There's no question that extra work was to be done or had to be done because of the volumetric differentiation. And the court, I believe, looked at this clause that said if there is a dispute that arises, the parties will do it. Now, what is the consideration supporting this under clear Texas law to when someone has breached a contract or has an opportunity to claim breach, they can terminate. They have to exercise that right very quickly and very promptly. So if D two it felt like they were put in a position where they were being forced to do extra work, they could do one of two things. They could claim breach and walk off the job or they could stay and continue to perform during the course of the job and sue for damages after the project is over or after they've completed their work. What happened in this case, Mr. Chad Peterson, if you read the subcontract clause, who has the thrift, that was Mr. Peterson. Mr. Peterson had this issue brought to his attention within the first five weeks of the project where all this excess oil was showing up, and he told the two continue to work once we find out what the total volumetric differences will issue you a change order. D two stayed on the site and continue to perform that work and got up to 98.6% complete of all their work. When Thompson thrift started telling them to do out of scope work, clean up the job site that other trades had done and redo work repetitively that other trades had come in and damaged. D two finally had enough, and they terminated the contract and left. They had not fully performed, and that's why the doctrine of substantial performance comes in and it's so important because they were entitled to be paid their original contract. Enough left reasonable and necessary cost to complete. And again, I'll remind the court. The only evidence that is in the record of what that is is Mr Sandell testifying that he gave back credit of $20,000, which represented what would be the reasonable cost to complete the work that was left undone as they left. So where are we? The next clause that is in the subcontract that I'd ask the court to take a look at is, uh, the last paragraph of Section four reads execution of the agreement is a representation. Um, that D two is visited the site became familiar with local conditions under which the work was to be performed and correlated by personal observation with the requirements of the contract documents. The subcontractor shall evaluate and satisfy itself as to the conditions and limitations under which it is to perform, including without limitation than it's a location, condition, layout and nature of the project site. There is nothing in there that talks about verifying the topographical elevations that Thompson thrift gave to D two at the bidding process time in which the court found that Thompson thrift had assured to that those engineering documents of the survey contained accurate information upon which deep why there was a negotiation that went back and forth between the different representatives leading up to the contract price, which was how it was calculated on a unit price basis. And if you go to Section C of subsection C of Section seven, there is a way to calculate what a change order should be for extra work. Once the parties get there, what happened was after Mr Peterson promised D two, he would issue a change order in early to mid June of 2015. He went back to the home office and for reasons we don't know, he quit or he left. A new project manager came in who refused to honor his agreement, and that is what the court found their failure to honor the promise they made to keep D two working on the project to finish the project rather than claim prior beat breach by Thompson thrift would have excused their performance by staying on and continuing to work and continuing to get to substantial completion. That was the consideration Thompson thrift got for D two staying on the project. So how do you calculate? We eventually get to the point where the truck loads are measured as they go off or evaluated that information and decided, based upon the testimony of Mr McCullough, that there is a fluff factor with excavated soil as opposed to in situ with soil. Therefore, the workload valuation that Mr that we had initially come out with 44,000 Mr McCullough reduced it to 40,000 cubic yards. And then the judge in her evaluation, based upon the different size of the tractor trailers, the trailers that the tractors were hauling off, calculated it down to 36. Uh, different kind of a minor distinction. Texas Department of Transportation is very strict rules and regulations about how much a trailer or a truck can load and safely haul off. And once it goes over 80,000 pounds, the truck is subject to be incited and impounded for taking something like that. So back to your question, Judge Costa, there is language in the subcontract itself that provides for a process and evaluation that does not put the risk of inaccurate design documents directly on the two. But it's kind of a shared responsibility, much like the I net case said that there was a decision or there was a contract clause in that contract that kind of had a sharing of the responsibility where the parties were in a had a responsibility to each other to operate in good faith and fair dealing in order to arrive at this decision to do it. We got the promise. It wasn't kept. And that was the basis of the court finding. Tom Thompson Thrift breached his subcontract by not following this provision. The only other aspect of that and what I said earlier in the last paragraph of Section four, I read what they were supposed to do and what the representations were. The very last sentence of that paragraph says, holding these subcontractors shall not be entitled to an adjustment contract price extension of time, resulting from subcontractors failure to fully comply with this paragraph. I would challenge opposing counsel point in the record where the court considered any of the representations by D two is not having been fulfilled. The what was done, what was found is that they had performed the work called for in the contract plans and specifications exactly the way it was supposed to have done. They, uh, I'm just kind of astounded at this particular situation where everything we did, we did right. The only thing that we didn't possibly do as best as we could have. It said, Okay, Mr Peterson made this promise, give it to us in writing. But Thompson Thrift waved that argument a long time ago by the way they handled the course of dealing between the court. It's uh, it took unfair advantage of D two in the negotiation process by one representing that it was a balanced side and it was anticipated that there would be no export or import. The only way you have export is if you have more spoil on the site or if more select bill is imported into the site. But there was no evidence that any of that occurred. There was no evidence of any over excavation. There was no evidence by Mr Moody, who was the hired gun of Thompson Thrift to say D to mess up their calculation in any way, shape or form. And with that, you're on up. All right. Thank you, sir. All right. We shift back to Mr Blackman for rebuttal. Thank you, Your Honor. We heard quite a few red herrings, I think, in that responsive argument. But we do all agree on one thing, and that's that D two received a topographical survey of the existing conditions and that its contractual obligation was to go from there to the final grading plan. D two says that it didn't mess anything up. The district court didn't find anything wrong. But that's exactly the point. What governs here is the project plans. The district court didn't find that the plans were wrong. And what Texas law says, dating back for many years, including in the Brown McKee case in the power versus state case in this, including through this court's decisions in I C C is that a party is not entitled to additional compensation, and it's not entitled to or be excused from performance if it does work that is contractually consistent or required in the performance of the contract. And no one disputes that the volume of excavation was that difference that delta between the existing conditions which weren't found to be wrong and the final grading point. And so D choose points about whether the plans change and whether there was excess import or export. None of that has to do with the claim that it presented to the district court. All of that is beside the point. None of it that goes to this court's decisions and the defective plans theory of the case. D two has said that the change order provision by itself is a risk shifting provision that creates extra work. But this court's decisions don't suggest that or don't hold that this contract says it 45 69 and 45 70 that D to agree that the documents that it received were sufficient to provide for the completion of the work. D two agreed to evaluate and satisfy itself. D two represented that it had visited the project site, and the contract said that the failure to do any of that or the failure to visit the site would not entitled D two to additional compensation. These are the same sorts of provisions that were present in this court's decision in I. C. C. They were present in El Paso Field Services versus Mass Tech, and they were present just a few months ago in bright excavation versus Poe Construction, which also dealt with an excavation subcontractor who wanted more compensation because the deal didn't turn out for it as profitably as it had hoped. So subcontract section seven certainly is not a risk shifting provision, and certainly the district court certainly made no finding that that was why that was the basis of its breach of contract claim. The district court didn't consider under I. C. C. Which again, the court's order doesn't cite whether or not those risk shifting provisions were present under this court's decision in I. C. C. Your honors, this case boils down to this. D two's contract says site grade. It which was undisputedly the difference between existing conditions and final grading claim, and the existing conditions weren't found to be wrong. We didn't tell D two how much soil it would excavate. They calculated that D two. It just turns out that once this project began, it didn't turn out is D two at home. But as the Texas Supreme Court said in El Paso versus Mass Tech, the role of courts is not to protect parties from their own agreements, but to enforce the contracts that parties enter into freely and voluntarily. That's what happened here. If this situation had been reversed, if D two had done these calculations and there had been 40,000 cubic yards less of soil than they thought there would be, they would hardly say that we could sue them seeking to reduce the contract price because it was excessive. That applies here. The district court rewrote the party's contract to compensate D two and save it from the calc the consequences of its own calculations. We asked this court to reverse. Thank you. All right. Thank you, Mr Blackman. Mr Summers, where are you geographically located? I'm in San Antonio, Your Honor. All right, Mr Blackman, where are you? Birmingham, Alabama. All right. Thank you, sir. We covered a lot of territory in three days of oil arguments, but fortunately, the zoom works. So, uh, thank you both for your port of this case. The case will be submitted and we will decide